# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

vs.                              No. CR 08-1681 MCA

**RYAN ABIFF SMITH,**

      Defendant.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant Ryan Abiff Smith's Motion to Suppress* [Doc. 26], filed May 19, 2009.  On August 18, 2009, the Court held an evidentiary hearing on Defendant's motion.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the motion based upon the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1.     Richard Evans is a detective with the Albuquerque Police Department ("APD").  He has been employed by the APD since August 2002. [Tr. of Aug. 18, 2009 suppression hearing (hereinafter "Supp. Hrng. Tr.")].

2.     Officer Phillip Moya also is employed by the APD and has been so employed for two and one-half years.  [Supp. Hrng. Tr.].

3.     Although Detective Evans currently is assigned to the APD's Crimes Against

Children Unit, on April 15, 2008, he was assigned to the Field Services Bureau, Foothills Area Command. [Supp. Hrng. Tr.].

4.    On April 15, 2008, both Detective Evans and Officer Moya were working the "graveyard" shift, separately patrolling the Far Northeast Heights area of Albuquerque. [Supp. Hrng. Tr.].

5.    In the early-morning hours of April 15, 2008, Detective Evans left his substation to begin a random patrol. According to Detective Evans, he was driving westbound on Lomas Boulevard when he observed an Oldsmobile heading in the same direction. While Detective Evans could see that the Oldsmobile displayed a temporary tag, he was not close enough to read the tag. Detective Evans estimated that, at this time, he was approximately 40 feet from the Oldsmobile. [Supp. Hrng. Tr.].

6.    The Oldsmobile "abruptly turned" northbound, and Detective Evans continued westbound on Lomas. [Supp. Hrng. Tr.].

7.    Detective Evans then turned northbound onto Juan Tabo Boulevard. He testified that "[o]n traveling down Juan Tabo northbound[,] the same vehicle pulled out of Sierra Grande [Avenue] in front of" him. [Supp. Hrng. Tr.].

8.    According to Detective Evans, "[a]t this time, the vehicle was in much closer proximity, [and he] observed [a] temp tag that was, or appeared to be altered. And not only was it altered, it was also expired." [Supp. Hrng. Tr.].

9.    I find and accept as credible Detective Evans' testimony that once the Oldsmobile was within closer range, he was able to see both that (1) the vehicle bore a temporary

2

tag, and (2) the temporary tag appeared to be altered and expired.  [Supp. Hrng. Tr.].

10.  At that time, Detective Evans decided to initiate a traffic stop of the Oldsmobile. Accordingly, he stopped the vehicle and made contact with the driver.  [Supp. Hrng. Tr.].

11.  The driver of the Oldsmobile identified herself as Christina Cruz.  [Supp. Hrng. Tr.].

12.  Detective Evans advised Ms. Cruz that he had stopped her because of the non-conforming temporary tag.   [Supp. Hrng. Tr.]

13.  Additionally, in the *Uniform Incident Report* that Detective Evans prepared, he wrote that "Ms. Cruz could not show proof of insurance. . . ." [Exh. A; *State of New Mexico Uniform Incident Report* at 2].

14.  Detective Evans' *Uniform Incident Report* lists Ms. Cruz as the registered owner of the Oldsmobile.  [Exh. A at 1].

15.  Detective Evans testified that he returned to his patrol unit and, when he "ran the standard checks[, Ms. Cruz] did come back with a confirmed misdemeanor warrant through NCIC."  [Supp. Hrng. Tr.].

16.  Detective Evans then reapproached the Oldsmobile and advised Ms. Cruz of the warrant, of which he testified she was aware.  Accordingly, Detective Evans had Ms. Cruz step out of her vehicle, at which time he placed her under arrest, put her in his patrol unit, and told her that he was going to have to tow the Oldsmobile.  [Supp. Hrng. Tr.].

17.  By the time that Detective Evans decided to have the Oldsmobile towed, Officer

3

Moya, in response to a dispatch alert, had arrived on the scene to assist, which Officer

Moya credibly testified "is a common practice" for both him and Detective Evans.

[Supp. Hrng. Tr.].

18. After Detective Evans had placed Ms. Cruz in his patrol unit, he returned to the

Oldsmobile.  Defendant Ryan Abiff Smith was in the passenger's seat.  [Supp. Hrng.

Tr.].

19. Detective Evans asked Mr. Smith to step out of the vehicle.   [Supp. Hrng. Tr.].

20. Although Detective Evans testified that he "had intentions of releasing [Mr. Smith]

at that time[,]" he also testified as to a routine he has developed when faced with

circumstances such as those arising in the early-morning hours of April 15, 2008.

Detective Evans explained:

> [A]fter seven years of working graveyard out in the field, you
> fall into certain habits and my habits were typically if I was
> going to tow a vehicle that contained a passenger, I would ask
> them if there was anything in the vehicle that belonged to them
> that they would need to take.

[Supp. Hrng. Tr.].

21. At the suppression hearing, Detective Evans could not remember *verbatim* what he

asked Mr. Smith about any items Mr. Smith might have had in the Oldsmobile.  At

one point in the proceedings he testified that his question to Mr. Smith was: "[I]s there

anything that belongs to you inside the vehicle that you want to take with you?"

[Supp. Hrng. Tr.].  However, he also testified that he could not remember precisely

what he asked, and that "[t]ypically it would be . . . do you have anything in the

4

vehicle that you would like to take?" [Id.].  Finally, his *Uniform Incident Report* reflects that Detective Evans "asked if [Mr. Smith] had anything in the vehicle. . . ." [Exh. A at 2].

22.   I find and accept as credible Detective Evans' testimony that, as of the time of the August 2009 suppression hearing, he could not remember the exact words he had used in April 2008.  However, I also find that the precise question asked by Detective Evans is not as important as the response provided by Mr. Smith.

23.   According to Detective Evans, Mr. Smith's response, which Detective Evans included as a direct quote in his *Uniform Incident Report*, was, "*If there is anything in that black bag, it's not mine.  I don't know what is in the bag.  I found it next to a tree.*" [Exh. A at 2].

24.   There is no evidence that Mr. Smith, upon exiting the Oldsmobile, attempted to take the black bag with him.

25.   When I questioned Detective Evans at the suppression hearing, he explained that, after he asked Mr. Smith if there was anything in the vehicle that belonged to him that he wanted to take with him, Mr. Smith *first* responded, "No," and *then* proceeded to tell Detective Evans that if there was anything in the black bag, it did not belong to him.  [Supp. Hrng. Tr.].

26.   I find that, while Mr. Smith stated "No" in response to Detective Evans's query, Mr. Smith's following assertion—"*If there is anything in that black bag, it's not mine.  I don't know what is in the bag.  I found it next to a tree*"—was an unsolicited

comment.

27.   When I asked Detective Evans whether, from his perspective, Mr. Smith was denying ownership of the black bag or its contents, and what he interpreted Mr. Smith's statement to mean, Detective Evans responded, "It seemed to me, from his statement, that he had found the entire contents, bag and all, under a tree. *And that he was denying ownership of all of it.*" [Supp. Hrng. Tr. (emphasis added)].

28.   I subsequently asked Detective Evans what was conveyed to him by Mr. Smith's use of the word "it" in the phrases, "*[I]t's not mine,*" and "*I found it next to a tree*." Detective Evans testified that he believed "it" to refer to "[a]ll of the bag, contents, anything in the vehicle, in the bag." [Supp. Hrng. Tr.].

29.   I find and accept as credible Detective Evans' testimony that he believed Mr. Smith was using "it" to refer to the bag itself, as well as the contents of the bag. I further find that, where Mr. Smith responded negatively to Detective Evans' query as to whether there was anything in the vehicle that he wanted to take with him, and then told Detective Evans that, if there was anything in the black bag, it was not his, Detective Evans reasonably reached the conclusion that Mr. Smith was denying ownership of the bag and its contents.

30.   After Mr. Smith made his statement to Detective Evans about the black bag, Detective Evans asked Mr. Smith to sit down on the curb behind the Oldsmobile. Detective Evans began what he called his inventory search, starting with the black bag to which Mr. Smith had referred. Detective Evans testified that the black bag "appeared to be

6

a portable DVD case, DVD player case, that was sitting on the passenger floorboard, in front of where [Mr. Smith] was sitting, probably underneath his legs." [Supp. Hrng. Tr.].

31. Detective Evans testified that it is standard operating procedure within the APD to conduct an on-site inventory search of a vehicle that is about to be towed because "there's opportunity, once the tow truck takes possession of the vehicle, for items to turn up missing." [Supp. Hrng. Tr.].

32. I find and accept as credible Detective Evans' testimony that it is standard operating procedure within the APD to conduct an inventory search at the scene, prior to the towing of the vehicle.

33. When Detective Evans opened the black bag, he discovered a loaded firearm. Detective Evans then asked Mr. Smith if he was a convicted felon, to which Mr. Smith replied that he was. [Supp. Hrng. Tr.].

34. Detective Evans then placed Mr. Smith in handcuffs and asked Officer Moya, who had arrived on the scene to assist, to continue with the inventory search. [Supp. Hrng. Tr.]. Detective Evans placed Mr. Smith and Ms. Cruz in separate vehicles and transported them to his substation where he advised them of their *Miranda* rights. [Supp. Hrng. Tr.].

35. Officer Moya testified that it is standard operating procedure within the APD to complete a *Tow Report* for a vehicle that is about to be towed. The *Albuquerque Police Department Tow Report* that was completed and authorized by Officer Moya

7

on April 15, 2008 lists, as inventory of the Oldsmobile, "CDs[,] misc[.,] white shoes[.]" [Exh. 1; *Albuquerque Police Department Tow Report*].

36.     Although both Detective Evans and Officer Moya testified to having seen a bottle of Crown Royal whisky in the Oldsmobile, there is no such bottle listed on the *Tow Report*. [See Exh. 1].

37.     Officer Moya testified that he did not include the eight-to-ten-inch-tall bottle (which Detective Evans described as "about half full") on the *Tow Report* because he did not believe it to be of "sufficient value." [Supp. Hrng. Tr.].

38.     Both Detective Evans and Officer Moya testified that the purpose of completing a *Tow Report* is to have a record of items of value that remain in the vehicle being towed.  They also both testified that APD policy allows for the towing of a vehicle where, as here, the driver is unable to furnish proof of insurance.  [Supp. Hrng. Tr.].

39.     Detective Evans further testified that a *Tow Report* is different from a *Property and Evidence Report*, which lists evidence that is seized and tagged into evidence, along with property deemed too valuable to leave with the vehicle.  [Supp. Hrng. Tr.].

40.     In this case, Detective Evans completed a *Property and Evidence Report* on which he listed, among other things, a fully loaded revolver and a methamphetamine pipe. [Doc. 28; Exh. B; *Albuquerque Police Department Property and Evidence Report*].

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On July 22, 2008, Mr. Smith was charged in a one-count *Indictment* with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). [Doc. 1].  On May 19, 2009, Mr. Smith filed *Defendant Ryan Abiff Smith's Motion to Suppress*, seeking to suppress all evidence obtained as a result of what he contends was Detective Evans' illegal search of the Oldsmobile on April 15, 2008.  [Doc. 26].  According to Mr. Smith, the search was constitutionally infirm because it (1) was conducted without a warrant and without consent; (2) does not come within the "search incident to arrest" exception to the warrant requirement; and (3) does not meet the criteria for a valid inventory search. [See generally Doc. 27].

The Government responds that Mr. Smith lacks standing to challenge the search of the black bag, in which it asserts he claimed no ownership and, therefore, abandoned.  The Government also contends that Mr. Smith lacks standing to challenge the search of the Oldsmobile, in which it asserts he had no proprietary or possessory interest. [Doc. 28 at 3-5].  Even if the Court were to find that Mr. Smith has standing to challenge the search, argues the Government, the search of the vehicle was valid as a lawful inventory search.  [Id. at 8].

### A.     The Fourth Amendment, Abandonment, and Standing

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, paper, and effects, against unreasonable searches and seizures. . . .'" United States v. Orduna-Martinez, 561 F.3d 1134, 1137 (10th Cir. 2009) (*quoting* U.S. Const. amend. IV).  Stated differently, the Fourth Amendment protects people from "unreasonable

intrusion into their legitimate expectations of privacy." United States v. Austin, 66 F.3d 1115, 1118 (10th Cir. 1995). However, a warrantless search of abandoned property is not unreasonable under the Fourth Amendment because when an individual voluntarily abandons property, he forfeits any expectation of privacy in it that he may have had. Id. (internal quotations omitted). Critically, "a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." United States v. Garzon, 119 F.3d 1446, 1449 (10th Cir. 1997). The government bears the burden of establishing abandonment by a preponderance of the evidence. United States v. Denny, 441 F.3d 1220, 1226 (10th Cir. 2006). However, the defendant bears the burden of demonstrating standing to assert a Fourth Amendment violation. See United States v. Dewitt, 946 F.2d 1497, 1499 (10th Cir. 1991).

"'The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object.'" Austin, 66 F.3d at 118 (quoting United States v. Jones, 707 F.2d 1169, 1172 (10th Cir. 1983)). The test subsumes both a subjective component (i.e., the defendant's intent, findings regarding which are reviewed for clear error) and an objective component (i.e., whether society would recognize the defendant's expectation as reasonable, findings regarding which are reviewed de novo). Garzon, 119 F.3d at 1449. Therefore, whether a defendant harbors a desire later to retrieve an item, such as a bag, such a desire is irrelevant to the Court's analysis of the objective component, since "[e]ven where a suspect does not subjectively intend to relinquish all ownership interest in an item, such suspect may nevertheless relinquish his or her reasonable expectation of privacy in the item." Denny, 441 F.3d at 1227. An expectation of privacy is a question of intent, which may be

inferred from words, acts, and other objective facts.  United States v. Hernandez, 7 F.3d 944, 947 (10th Cir. 1993).

In the instant case, Mr. Smith contends that when he told Detective Evans, "*If there is anything in that black bag, it's not mine.  I don't know what is in the bag.  I found it next to a tree[,]*" see Exh. A at 2, he was disavowing knowledge of the bag's contents only and not the bag itself. [See Doc. 30 at 2 ("Smith never stated that the black bag was not his. He only disavowed knowledge of the contents.")].

As an initial matter, I note that I have already found that Detective Evans reasonably interpreted Mr. Smith's statement as referring to the black bag *itself*, as well as its contents. I credited Detective Evans' explanation for the following reasons.  First, when Detective Evans asked if there was anything in the vehicle that belonged to Mr. Smith or that Mr. Smith wanted to take with him, Mr. Smith responded, "No."  Mr. Smith then exited the Oldsmobile without the black bag, which was sitting  on the floor of the passenger's side of the vehicle, and told Detective Evans, *"If there is anything in that black bag, it's not mine. I don't know what is in the bag.  I found it next to a tree."*  Exh. A at 2.  Additionally, Detective Evans credibly testified that he believed Mr. Smith's use of the pronoun "it" to mean "*[a]ll of the bag*, contents, anything in the vehicle, in the bag."  [Supp. Hrng. Tr. (emphasis added)].  Finally, in response to my direct questioning, Detective Evans also explained that he interpreted Mr. Smith's statement as a denial of ownership of "all of it . . . contents, bag and all. . . ." [Id.].  In light of these circumstances, I reject Mr. Smith's argument that "[h]e only disavowed knowledge of the contents of the bag, not the bag

itself[,]"  [see Doc. 30 at 2], and turn to the issue of whether Mr. Smith abandoned the property in question.

It bears repeating that the test for abandonment subsumes both a subjective and an objective component.  See Garzon, 119 F.3d at 1449.  For that reason, a defendant's desire to recover a left-behind item at some future time is irrelevant to the Court's analysis of the objective component, since "[e]ven where a suspect does not subjectively intend to relinquish all ownership interest in an item, such suspect may nevertheless relinquish his or her reasonable expectation of privacy in the item." Denny, 441 F.3d at 1227. Stated another way, "[r]egardless of an individual's subjective intent or understanding, the individual is treated as having abandoned an object if it would be unreasonable in the circumstances for the person to have an expectation of privacy with respect to that object." United States v. Burbage, 365 F.3d 1174, 1178 (10th Cir. 2004).

Such was the situation in Denny, where, in response to a DEA agent's inquiry to a train passenger whether a plastic bag under a seat in the passenger's sleeper compartment belonged to the passenger, the passenger responded that, "'no, he didn't know anything about that bag.'" Denny, 441 F.3d at 1223.  Considering the plastic bag to have been abandoned, the DEA agent opened it.  A brick of cocaine was inside. Id.

Reversing the district court's grant of the defendant's motion to suppress, the Tenth Circuit determined that in placing the plastic bag under the seat, the defendant "obviously was attempting to hide it from [the DEA agent]—much the same way a suspect running from police seeks to hide his contraband by throwing it in the bushes." Denny, 441 F.3d at 1226.

Still, reminding that the test for abandonment includes both a subjective and an objective component, the circuit explained that its inquiry did not end with a conclusion that the defendant "undoubtedly intended to retrieve the bag once the agent was no longer on his trail." Id. at 1227.  Instead, there remained the question whether the defendant "maintained an objectively reasonable expectation of privacy in the bag . . . when, in response to [the DEA agent's] inquiries, he expressly disclaimed ownership of the bag and its contents." Id. Answering this question in the negative, the circuit held that when the defendant "affirmatively denied owning the plastic bag he . . . voluntarily relinquished any *reasonable* expectation of privacy in its contents."  Id. at 1228 (emphasis in original).

Verbal disclaimers of ownership play a big role in the abandonment analysis, although other factors come into play as well.  See Hernandez, 7 F.3d at 847 (expectation of privacy inferred from words, acts, and other objective facts).  This is because, "[s]ubjective intent aside, 'one who disclaims ownership is likely to be found to have abandoned ownership. Phrased another way, disclaiming ownership is tantamount to declaring indifference, and thus negates the existence of any privacy concern in a container's contents.'" Denny, 441 F.3d at 1227 (*quoting* United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994)).  To be sure, "[t]o deny ownership is to announce to the world, 'you want it, you can have it, as far as I'm concerned.'" Burbage, 365 F.3d at 1178 (both backpack and portfolio inside it were abandoned when defendant affirmatively denied ownership of backpack, notwithstanding his subsequent statement that his portfolio was inside backpack).  Indeed, the Tenth Circuit has unambiguously remarked that "[e]very case in which [it has] found abandonment

13

involved a situation where the defendant either (1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment." Garzon, 119 F.3d at 1452.

The law on abandonment is well-settled, and a Westlaw search reveals a number of federal cases in which the defendant's statement, "It's not mine," or words to that effect, has resulted in a determination of abandonment.  See, e.g., United States v. Springer, 946 F.2d 1012, 1015, 1017 (2nd Cir. 1991) (no Fourth Amendment violation resulted from search of suitcase following defendant's assertion to "[g]o ahead [and search], it's not mine[,]" as defendant's "consistent[] disclaime[r of] any ownership of the suitcase" rendered it abandoned); United States v. Rush, 890 F.2d 45, 46 (7th Cir. 1989) (defendant had no reasonable expectation of privacy in suitcase he abandoned by pointing to his traveling companion and telling questioning officer, "[i]t's his. It's not mine."); United States v. Carlisle, 2008 WL 5111346, at *10, 11 (N.D.Ind. Dec. 3, 2008) (denying motion to suppress drugs found in backpack of which defendant disavowed ownership by (1) claiming that backpack belonged to someone else; (2) denying knowledge of backpack's contents; and (3) everything" except for "it's not mine" in distancing himself from it); United States v. Struckman, 2006 WL 1207963, at *4 (D.Or. May 3, 2006) (denying motion to suppress firearm found in backpack where defendant both denied ownership and relinquished control of the backpack and, in response to questioning officer's inquiry as to whether there was a gun in the backpack, defendant replied, "I don't know. It's not mine."); United States v. Bailey, 979 F.Supp. 1319, 1322, 1324 (D.Kan. 1997) (denying motion to suppress drugs

found in alley where defendant "made the following unsolicited comment: 'If you find anything on the ground in that area, it's not mine' or something to that effect[,]" since defendant had "disavowed ownership of any item in the alley[;]" United States v. Flores, 1994 WL 180269, at *2-*4 (denying motion to suppress cocaine found in suitcase that defendant had abandoned when he responded to inquiry officers' query to search suitcase with, "It's not mine—go ahead.").

In light of the facts presented, I conclude that Mr. Smith retained no legitimate expectation of privacy in the black bag that Detective Evans found in Ms. Cruz's vehicle. Assuming without deciding that Mr. Smith harbored a desire to recover the bag at a later time and, therefore, did not *subjectively* intend to relinquish any ownership interest in it, Mr. Smith cannot be said to have retained any *objectively* reasonable interest in the property where (1) in response to Detective Evans' query as to whether there was anything in the Oldsmobile that belonged to Mr. Smith or that Mr. Smith wanted to take with him, Mr. Smith responded, "No;" and (2) after responding in the negative to Detective Evans' query, Mr. Smith made the following unsolicited comment: "*If there is anything in that black bag, it's not mine.  I don't know what is in the bag.  I found it next to a tree.*" See, e.g., Bailey, 979 F.Supp at 1322, 1324 (defendant possessed no legitimate expectation of privacy in crack cocaine that was found in alleyway after defendant, unsolicitedly, told police officer, "If you find anything on the ground in that area, it's not mine."). For these reasons, I conclude that Mr. Smith abandoned the black bag and its contents when he told Detective Evans, "*If there is anything in that black bag, it's not mine.  I don't know what is in the bag.  I found it next*

15

*to a tree.*"  Because Mr. Smith lacks an objectively reasonable expectation of privacy in the black bag and its contents, he is without standing to challenge the search thereof.

### B.    Search Incident to an Arrest

Mr. Smith next asserts that the evidence in question must be excluded because the search of the Oldsmobile, which was conducted without a warrant, does not come within the "search incident to an arrest" exception to the warrant requirement. [See Doc. 27 at 2-3].  In support, Mr. Smith relies on the recently decided United States Supreme Court decision, Arizona v. Gant, 129 S.Ct. 1710 (2009).   The Government responds that Mr. Smith's reliance on Gant is "misplaced" because it was Ms. Cruz, *not* Mr. Smith, who was under arrest at the time of Detective Evans' search, and that Mr. Smith may not vicariously assert Ms. Cruz's Fourth Amendment rights "in an attempt to suppress evidence of *his* guilt." [Doc. 28 at 5].

In Gant, the United States Supreme Court held that police may search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search, and that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."  Gant, 129 S.Ct. at 1719 (internal quotation omitted).  Thus, explained the Court, where Rodney Gant, having been arrested for driving with a suspended license, was handcuffed and locked in the backseat of one of three patrol cars on the scene, the ensuing search of the passenger compartment of his vehicle, which revealed a gun and a bag of cocaine, was unreasonable.

16

For one thing, five police officers outnumbered Mr. Gant and his two co-arrestees, all of whom had been handcuffed and secured in separate patrol units at the time of the search. Accordingly, "[Mr.] Gant clearly was not within reaching distance of his car at the time of the search." Id. Additionally, as Mr. Gant had been arrested for a traffic violation (his companions were arrested for drug offenses), police could not reasonably have believed that evidence of the offense of arrest might have been found in the vehicle. Id.

In the instant case, however, it was Ms. Cruz, not Mr. Smith, who had been arrested as of the time of the search. That much appears to be undisputed. [See Doc. 27 at 3 ("[W]hen Evans searched the vehicle, Cruz was already in custody, so there was no danger of her destroying evidence or harming an officer."); Doc. 28 at 1, 2 "Officer Evans . . . placed Cruz under arrest, placed her in the back of his police vehicle and . . . then initiated an inventory search of the vehicle. . . .")]. Moreover, Detective Evans testified that he did not place Mr. Smith under arrest until *after* he had opened the black bag, found the firearm, and determined that Mr. Smith had previously been convicted of a felony offense.

Still, Mr. Smith seeks to attack the search (and analogize the facts of his case to those existing in Gant) on the ground that because *Ms. Cruz* was already in custody at the time of the search, "there was no danger of *her* destroying evidence or harming an officer." [Doc. 27 at 3 (emphasis added)]. However,

> Fourth [A]mendment rights are personal and may not be asserted vicariously. Thus, suppression of evidence will be an appropriate remedy only when a person's rights have been violated by the search itself; it is not enough that a person is aggrieved by the introduction of damaging evidence derived

17

from the search.

United States v. Gama-Bastidas, 142 F.3d 1233, 1238 (10th Cir. 1998) (internal quotations and citations omitted). As the proponent of suppression, Mr. Smith bears the burden of demonstrating that his *own* rights were violated. Id. Instead, he attempt vicariously to assert Ms. Cruz's Fourth Amendment rights. This he may not do. Accordingly, I conclude that Gant does not apply to the facts of the instant case.

### C.      The Search of the Oldsmobile as a Lawful Inventory Search

As his final argument, Mr. Smith maintains that the search of the Oldsmobile cannot be justified as a legitimate inventory search because the search (1) was not conducted pursuant to standardized procedures, and (2) was investigatory in nature. [Doc. 27 at 4]. The Government disagrees. [See Doc. 28 at 5-7].

As an initial matter, I return to the issue of Mr. Smith's standing, this time as it relates to the search of the vehicle. It is undisputed that, at the time Detective Evans stopped the Oldsmobile on April 15, 2008, Mr. Smith was a passenger in the vehicle. [See Doc. 27 at 1 ("On April 15, 2008, Ryan Smith ("Smith") was a passenger in a vehicle driven by Christina Cruz ("Cruz") when the vehicle was stopped by APD Officer Richard Evans ("Evans"). . . .")]. It also is undisputed that on that date, Christina Cruz was the registered owner of the Oldsmobile. [See Exh. A at 1].

"[A] passenger who asserts neither a possessory nor a property interest in a vehicle 'would not normally have a legitimate expectation of privacy' in the vehicle protected by the Fourth Amendment." United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir.

1995) (*quoting* <u>Rakas v. Illinois</u>, 439 U.S. 128, 148-149 (1978)).  Moreover, "[a] passenger generally does not establish standing to contest the search of a vehicle merely because he was charged with a possessory crime." <u>Gama-Bastides</u>, 142 F.3d at 1239.  Finally, in a case with facts not very different from those presented here, the Tenth Circuit held that a defendant/proponent of a suppression motion had no protectable Fourth Amendment privacy rights where (1) he was a non-owner passenger in the automobile that was stopped and searched; (2) the owner was present; and (3) the defendant did not assert any interest in the seized contraband.  <u>See</u> <u>United States v. Jefferson</u>, 925 F.2d 1242, 1251 n.7 (10th Cir. 1991) (but clarifying that the Circuit "d[id] not intend to establish a *per se* rule that *any* time the owner of a vehicle is present, the driver has no protectable privacy interest[,]" and explaining that its holding was limited to the facts before it).  For these reasons, I conclude that Mr. Smith, as passenger *qua* passenger, has failed to establish his standing to contest the search of the Oldsmobile. <u>See</u> <u>United States v. Erwin</u>, 875 F.2d 268, 271 (10th Cir. 1989) ("[D]efendant, who did not testify at the suppression hearing, failed to introduce any evidence to show legitimate ownership or possession of the automobile, which might establish a legitimate expectation of privacy in the particular area searched.").

Were I to conclude differently, however, and determine that Mr. Smith has demonstrated standing to challenge the search of Ms. Cruz's vehicle, I would nevertheless hold the search of the Oldsmobile to be a lawful inventory search.  <u>But see</u> <u>United States v. Jackson</u>, 189 F.3d 502, 508-509 (7th Cir. 1999) (defendant who failed to demonstrate legitimate expectation of privacy in vehicle he was driving lacked standing to challenge

inventory search that revealed plastic bag of crack cocaine in trunk).

The Supreme Court has held that "inventory searches are . . . a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987). Neither a warrant nor probable cause is required for an inventory search because the focus of a properly conducted inventory search is routine administrative caretaking procedures. See id. Indeed, as the Tenth Circuit has explained, to be justified as an inventory search, the search cannot be investigatory in nature; instead, the search must be used "only as a tool to record the defendant's belongings to protect the police from potential liability." United States v. Edwards, 242 F.3d 928, 938 (10th Cir. 2001).

"A lawful inventory search promotes three administrative purposes: 'the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.'" United States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2008) (quoting South Dakota v. Opperman, 428 U.S. 364, 369 (1976)). An inventory search does not violate the Fourth Amendment simply because the police do not use the least intrusive means available, but such a search must follow "standardized inventory procedures[,]" Illinois v. Lafayette, 462 U.S. 640, 648 (1983), that are actually "designed to produce an inventory." Florida v. Wells, 495 U.S. 1, 4 (1990). In other words, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence [and t]he individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime[.]'" Id. (quoting Bertine,

20

479 U.S. at 376.  Additionally, good and bad faith on the part of the police play a part in the reasonableness of inventory searches, and "reasonable police regulations relating to inventory procedures *administered in good faith* satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.  Bertine, 479 U.S. at 374 (emphasis added).

In the instant case, Mr. Smith contends that the search of the Oldsmobile cannot be justified as a legitimate inventory search because (1) it was not conducted pursuant to any sort of standardized procedures (*i.e.*, the search was done on-site as opposed to after impoundment), and (2) Detective Evans' sparse *Property and Evidence Report*, which shows that only the black bag and its contraband contents were inventoried, proves that the search was done for investigative purposes. [See Doc. 27 at 4; see also Doc. 28; Exh. B].

As both Detective Evans and Officer Moya testified at the suppression hearing, the *Property and Evidence Report* lists items or property seized from a vehicle for future tagging into evidence, while a separate *Tow Report* lists non-contraband items that are *not* removed from the vehicle and are deemed of value.  Detective Evans further testified—and I credit this testimony—that it is standard operating procedure within the APD to conduct an on-site inventory search of a vehicle that is about to be towed because "there's opportunity, once the tow truck takes possession of the vehicle, for items to turn up missing."  [Supp. Hrng. Tr.]. While the Government concedes—and this Court agrees—that Officer Moya could have been more specific in his *Tow Report,* see Doc. 28 at 6, an accounting that lacks precision will not necessarily doom an inventory search, as the Second Circuit recently explained in

21

United States v. Lopez, 547 F.3d 364 (2nd Cir. 2008).

In Lopez, officers conducting an inventory search itemized objects taken from the vehicle only where they deemed the objects to be "worth something." On the other hand, items the officers assessed not to be "worth something" or "of no substantial value (such as antifreeze, a beach chair, and an umbrella) "were covered by a general catch-all description: 'the belongings from the vehicle.'" Lopez, 547 F.3d at 368.  The Second Circuit upheld the search as a valid inventory search, calling without merit the argument that "the failure to itemize each object found in the car, instead of covering items of lesser value under a general catch-all category of 'personal belongings,' is incompatible with the Supreme Court's warning that 'inventory searches should be designed to produce an inventory.'" Id. at 371 (quoting Wells, 495 U.S. at 4).

The circuit went on to explain:

> The concept of an inventory does not demand the separate itemization of every single object.
>  . . .
> That an officer might use a catch-all to cover objects of little or no value in no way casts doubt on the officer's claim that the purpose of the search was to make an inventory. It would serve no useful purpose to require separate itemization of each object found, regardless of its value, as a precondition to accepting a search as an inventory search. Such an obligation would furthermore interfere severely with the enforcement of the criminal laws by requiring irrational, unjustified suppression of evidence of crime where officers, conducting a bona fide search of an impounded vehicle, found evidence of serious crime but, in making their inventory, failed to distinguish between the maps of Connecticut and New York, or failed to list separately the soiled baby blanket or a pack of gum. Imposing a requirement to identify each item separately, regardless of lack

> of value, would furthermore add considerable administrative
> burden without in any way advancing the purposes of the Fourth
> Amendment to protect the public from "unreasonable searches
> and seizures."

Lopez, 547 F.3d at 371-372.

As for the other inventory-search element (standardized procedures) the Second

Circuit rejected the defendant's argument that because not every object taken out of the car

was itemized, the search was not conducted under standardized procedures.  Instead, the

Court explained that

> [t]he unchallenged testimony of both Officer Arroyo and Sgt.
> Barrett established that there is a uniform standardized policy in
> the New York City Police Department to do a complete
> inventory search of the contents when a car is impounded.
> Arroyo testified, "[Y]ou have to do a total inventory of the
> vehicle. Everything has to come out." Sgt. Barrett confirmed
> that it is the responsibility of the officer to conduct an inventory
> search of an impounded car in order "to see if there were any
> items that needed to be safeguarded." This evidence was
> unchallenged and was credited by the district court.
> Accordingly, the purposes of the Supreme Court's requirement
> of a standardized policy were satisfied.

Lopez, 547 F.3d at 370.

In this case, Mr. Smith has not contested Detective Evans' authority to have the

Oldsmobile towed, and I take judicial notice of N.M. STAT. ANN. § 66-3-19(E),[1] and § 8-5-

---

[1]  Section 66-3-19(E) of the New Mexico Statutes provides, in pertinent part, that

> [i]t is unlawful to operate or transport or cause to be transported
> upon any highways in this state any vehicle . . . subject to
> registration under the provisions of the Motor Vehicle Code
> without having paid the registration fee or without having secured
> and constantly displayed the registration plate required by the

2-4 of the Traffic Code of the Revised Ordinances of Albuquerque, New Mexico, 1994,[2] both of which authorize the seizure of a vehicle under circumstances such as those present on April 15, 2008.  See United States v. Williams, 442 F.3d 1259, 1261 (10th Cir. 2006) (*quoting* United States v. Coffman, 638 F.2d 192, 194 (10th Cir.1980)) ("That the courts are allowed to take judicial notice of statutes is unquestionable.").  Additionally, Officer Moya provided uncontroverted testimony that it is standard operating procedure within the APD to complete a *Tow Report* as part of an inventory search.

Mr. Smith argues that the non-specific *Tow Report* that Officer Moya completed supports his argument that the search of the Oldsmobile was investigatory in nature. [See Doc. 30 at 3 ("The APD Tow Report provided by the government in this case does nothing

---

Motor Vehicle Code.
. . .
Any duly appointed deputy or agent of the department has the authority to seize the vehicle. . . .

N.M. STAT. ANN. § 66-3-19(E).

[2] Pursuant to the Revised Ordinances of Albuquerque, New Mexico,

[a]ny municipal police officer, or any municipal employee who is authorized to direct traffic or enforce state or local parking or motor vehicle laws, may order the impoundment of any vehicle within the municipal corporate limits, without prior notice to the owner or operator thereof, under the following circumstances:

(7)     When the driver or person in control of a vehicle is lawfully taken into custody by a police officer. . . .

ROA 1994 § 8-5-2-4 (accessible at http://www.amlegal.com).

to disprove that the search of the vehicle was investigatory in nature.")].  He bases this

argument, in part, on the fact that the Crown Royal whisky bottle found in the vehicle was

not noted on the noted on the report. [See  Doc. 30 at 3-4].  Officer Moya, however, credibly

testified that while he will list on a *Tow Report* items of value, he did not believe the Crown

Royal bottle, which Detective Evans described as being half-full, to be of "sufficient value."

[Supp. Hrng. Tr.].

Officers need not lack the *expectation* that they may find evidence of criminal conduct

in order for an inventory search to be valid.  While

> [t]he Fourth Amendment does not permit police officers to disguise
> warrantless, investigative searches as inventory searches . . . [w]hen
> officers, following standardized inventory procedures, seize, impound,
> and search a car in circumstances that suggest a probability of
> discovering criminal evidence, the officers will inevitably be motivated
> in part by criminal investigative objectives. Such motivation, however,
> cannot reasonably disqualify an inventory search that is performed
> under standardized procedures for legitimate custodial purposes. Under
> the Supreme Court's precedents, if a search of an impounded car for
> inventory purposes is conducted under standardized procedures, that
> search falls under the inventory exception to the warrant requirement
> of the Fourth Amendment, notwithstanding a police expectation that the
> search will reveal criminal evidence. If good faith is a prerequisite of
> an inventory search, the expectation and motivation to find criminal
> evidence do not constitute bad faith.

Lopez, 547 F.3d at 372.

In the instant case, there has been no allegation that either Detective Evans or Officer

Moya conducted the inventory search in bad faith.  At most, Mr. Smith argues that because

the officers failed to itemize each object removed from the Oldsmobile, "it is difficult to

ascertain how the officers' search could be viewed as administrative in purpose." [Doc. 30

at 3].  However, neither a failure to itemize nor an officer's expectation that contraband may be found will doom an otherwise legitimate inventory search.  See <u>Lopez</u>, 547 F.3d at 372. On the basis of the foregoing, I conclude that the search of the Oldsmobile comes within the inventory-search exception to the Fourth Amendment's warrant requirement.

## III. CONCLUSION

For the reasons stated more fully herein, I conclude that Defendant Ryan Smith abandoned the black bag that is the subject of his suppression motion, as well as the bag's contents, when he told Detective Evans, "*If there is anything in that black bag, it's not mine. I don't know what is in the bag.  I found it next to a tree.*"  As Mr. Smith lacks a reasonable expectation of privacy in the property, he does not have standing to seek its exclusion.  I also conclude that Mr. Smith, as a passenger *qua* passenger of the vehicle that was stopped, lacks standing to challenge the search of that automobile.  Finally, even if Mr. Smith were able to demonstrate standing to challenge the search of the vehicle, I conclude that the search was valid as a lawful inventory search.  For these reasons, Mr. Smith's motion to suppress will be denied.

**IT IS, THEREFORE, ORDERED** that *Defendant Ryan Abiff Smith's Motion to Suppress* [Doc. 26] is **DENIED**.

**SO ORDERED** this 2nd day of December, 2009, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge